ORDERED.

**Dated:  September 15, 2017**

Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                            Case No. 8:16-bk-07190-MGW
                                                                      Chapter 11

Namal Enterprises, LLC,

          Debtor.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In its first bankruptcy case, the Debtor confirmed a plan that expressly

acknowledged that the Debtor owed TD Bank, which held a mortgage on the

Debtor's property, $2,001,929.63 on the parties' loan. Although the Debtor was only

obligated to pay TD Bank $1.4 million under the plan in the Debtor's first case, that

plan provided that TD Bank would be owed the full $2,001,929.63 (less any

payments made under the plan) in the event the Debtor defaulted on its plan

payments. But when the Debtor ultimately defaulted and TD Bank sued in state

court, the state court only awarded the Bank $1,538,971.38, which was based on the

reduced amount the Debtor had agreed to pay under its confirmed plan in its first

case. Now, in the Debtor's second bankruptcy case, TD Bank has filed a

$2,668,062.44 proof of claim, which includes $1,962,581.08 in principal (the $2,001,929.63 due under the original loan less the payments made under the Debtor's previous confirmed plan). The Court must now decide whether the state court final judgment precludes TD Bank from seeking more than $1,538,971.38 in this bankruptcy case.

As a threshold matter, the *Rooker-Feldman* doctrine does not preclude the Court from exercising jurisdiction over this contested matter. The *Rooker-Feldman* doctrine only applies where the state court action has ended. And here, the state court action hasn't ended yet because TD Bank appealed the state court final judgment and that appeal remains pending. Moreover, the Court declines to give the state court judgment preclusive effect because to do so here would result in a manifest injustice. Accordingly, the Court concludes the Debtor's objection to TD Bank's proof of claim should be overruled and that TD Bank is entitled to an allowed claim in the amount of $2,668,062.44.

## FINDINGS OF FACT

At the time it filed this chapter 11 case, the Debtor was operating a hotel known as the Blue Inn.[1] In 2008, the Debtor borrowed $2 million from TD Bank to build the hotel.[2] The Debtor gave TD Bank a $2 million note secured by a mortgage on the Debtor's hotel.[3] Two years later, the Debtor filed its first chapter 11

---

[1] Doc. No. 113.

[2] Debtor's Ex. 5 at Affidavit of Vicki Ketikidis; Debtor's Ex. 45.

[3] Debtor's Ex. 5 at Affidavit of Vicki Ketikidis; Debtor's Ex. 45.

bankruptcy case.[4] In the chapter 11 plan it confirmed in its first case, the Debtor acknowledged it owed TD Bank $2,001,929.63 on the original note.[5]

Under its confirmed plan in that case, the Debtor agreed to issue TD Bank two notes in satisfaction of its $2,001,929.63 secured claim: a $1.1 million note (Note A); and a $300,000 note (Note B).[6] Note A was amortized over 25 years, with a 7-year balloon payment. For the first five years, the monthly payment due under Note A was $6,430.49.[7] No payments were due—nor did any interest accrue—under Note B.[8] Note B simply matured when the Debtor either sold its hotel or refinanced the loan.[9] The confirmed plan also required the Debtor to pay its past due property taxes for 2009 by a specified date, as well as its current property taxes as they came due. If the Debtor defaulted under its confirmed plan, the plan specifically provided that "the amount owed to TD Bank is the full amount due under the loan documents in the amount of $2,001,929.63," less any payments the Debtor made on Notes A and B.[10]

---

[4] The Debtor's previous case was styled *In re Namal Enterprises, Inc.*, Case No. 8:10-bk-11988-MGW.

[5] Debtor's Ex. 2 at Ex. C, § C(3).

[6] *Id.* at Ex. C, § C(3)(a)-(b).

[7] *Id.* at Ex. C, § C(3)(a).

[8] *Id.* at Ex. C, § C(3)(b).

[9] *Id.*

[10] *Id.* at § C(3)(n).

It is undisputed that the Debtor defaulted under the confirmed plan. For starters, the Debtor failed to pay its 2009 and 2013 property taxes.[11] More important, the Debtor failed to make its monthly payments under Note A.[12] So on July 30, 2014, TD Bank sued to foreclose its mortgage and recover damages.[13]

The complaint was not, to say the least, a model of clarity. In the foreclosure count, TD Bank alleged it was accelerating all amounts due under the confirmed plan and its original $2 million note with the Debtor:

> As a result of the default of [the Debtor] in making payment as required, [TD Bank] exercised its right to accelerate the balance due under the Note, Mortgage, Amended Plan of Reorganization and Order Approving Plan which sums are due and owing.[14]

In the foreclosure count's ad damnum clause, TD Bank asked the Court to take jurisdiction and ascertain the amount it was owed. But the count on the note alleged that the Debtor owed $985,385.40 (plus interest, late fees, and advances) on Note A and $300,000 (plus interest, late fees, and advances) on Note B, which totaled $1,285,385.40.[15] Suffice it to say, it was ambiguous whether TD Bank was seeking the $2,001,929.63 default amount due under the confirmed plan (less any payments made) or the $1,285,385.40 due under Notes A and B.

---

[11] *Id.* at ¶¶ 15 – 17.

[12] *Id.* at ¶¶ 18 – 19.

[13] *Id.* at ¶¶ 13 – 41.

[14] *Id.* at ¶¶ 3, 4 & 17.

[15] *Id.* at ¶¶ 39 – 40.

In January 2015, TD Bank moved for summary judgment.[16] Like its complaint, the Bank's summary judgment motion was not a model of clarity either. It too referenced accelerating amounts due under the Debtor's confirmed plan and the original $2 million note, which would have been the $2,001,929.63 default amount (less any payments on Notes A and B).[17] But the summary judgment motion alleged that the Debtor owed the principal amount of $1,042,691.42 on Note A and $300,000 on Note B, which totaled $1,342,691.42.[18] Although one of the affidavits submitted in support of the Bank's summary judgment motion attached the confirmation order from the Debtor's first chapter 11 case, the affiant testified in the affidavit that the Bank was owed $1,277,323.90 on Note A and $330,313.13 on Note B, for a total of $1,607,637.03.[19]

Because there was no real dispute that the Debtor had defaulted, the state court granted summary judgment as to liability.[20] But it determined there was an issue of fact as to the amounts owed. TD Bank then filed a motion to determine the amount the Debtor owed,[21] which the state court held an evidentiary hearing on in March 2015.[22]

---

[16] Debtor's Ex. 4.

[17] *Id*. at ¶¶ 2, 3 & 10.

[18] *Id*. at ¶¶ 12 & 13.

[19] Debtor's Ex. 5 at Affidavit of Vicki Ketikidis, ¶¶ 12 – 13.

[20] Debtor's Ex. 9 at ¶ 2; Debtor's Ex. 11 at p. 5, ll. 4 – 21.

[21] Debtor's Ex. 9.

[22] Debtor's Ex. 11.

At the March 2015 evidentiary hearing, the state court took judicial notice of the confirmation order, which showed the Debtor was entitled to the $2,001,929.63 default amount,[23] and received into evidence payment histories for Notes A and B.[24] The payment histories showed the Debtor had paid $163,293.96 in principal and interest on Note A (the Debtor made no payments on Note B because none were due).[25] The payment histories and testimony also showed the Bank had advanced $129,880.18 on the loans.[26] Taking into account the payments and advances, the Debtor owed the principal amount of $1,968,515.85.

But the state court said the Bank didn't prove that amount at trial. The state court agreed the starting point was the confirmation order.[27] But it said the evidence on the advances and credits was conflicting. According to the state court, the loan payment histories showed the Debtor owed $1,974,306.85.[28] The state court, however, concluded that a Bank employee testified the Debtor owed $2,001,000, almost $27,000 more than the payment histories showed was owing.[29] Given what it concluded was conflicting evidence, the state court ruled that the only

---

[23] Debtor's Ex. 12 at ¶ B.

[24] *Id.*

[25] Debtor's Ex. 11 at p. 16, ll. 9 – 24.

[26] *Id.* at p. 18, ll. 12 – 22.

[27] Debtor's Ex. 12 at ¶ B.

[28] *Id.* at ¶ D. The state court's calculation includes a computational error. The state court concluded the Debtor had made payments totaling $157,542.96. *Id.* In fact, the payments totaled $163,330. *Id.*

[29] *Id.*

amount TD Bank proved was the amount due on Notes A and B.[30] So on June 16, 2015, the state court entered an order determining that the Bank was only entitled to $1,538,971.39.[31]

That same day, the Debtor asked the Bank to release its lien in exchange for $1,538,971.39 so that the Debtor could sell the hotel.[32] As it turns out, while the parties were fighting over the amount due, the Debtor had contracted to sell the hotel for $2.73 million.[33] The sale, which the Bank heard about for the first time on June 16, 2015, apparently was scheduled to close the next day.[34]

The Bank needed more than one day to evaluate the offer.[35] With less than 24 hours' notice, the Bank had no opportunity to conduct the customary due diligence.[36] And in the Bank's view, the Debtor had orchestrated the sale to cut off the Bank's appellate rights, resulting in a significant windfall to the Debtor.[37] So the Bank suggested the Debtor close on the sale and then escrow the sales proceeds.[38] But until there was a final order entered, the Bank refused to accept

---

[30] *Id.* at ¶ E.

[31] *Id.*

[32] Doc. No. 278, at p. 63, l. 19 – p. 64, l. 11.

[33] Debtor's Ex. 23 at p. 8, l. 19 – p. 13, l. 16.

[34] Doc. No. 278, p. 64, l. 12 – p. 65, l. 6.

[35] *Id.*

[36] *Id.* at p. 69, l. 24 – p. 70, l. 24.

[37] *Id.* at p. 67, l. 22 – p. 68, l. 4.

[38] *Id.* at p. 64, l. 12 – p. 65, l. 6.

anything less than the roughly $2.3 million it said was owing at the time. Because the Debtor and TD Bank did not agree on a payoff amount, the buyer refused to close on the sale and demanded the return of its deposit.[39]

On October 21, 2015, more than five months after the state court determined the amount due, the state court entered a final judgment in the amount of $1,538,971.38, reserving jurisdiction to determine entitlement to attorney's fees and costs.[40] The Bank had previously appealed the state court order determining the amount due.[41] But the appellate court treated the notice of appeal as an interlocutory appeal and restarted the appeal after the final judgment was entered.[42] The Bank never sought a stay pending appeal.

On August 22, 2016, the Debtor filed this chapter 11 case. TD Bank filed a $2,668,062.44 proof of claim seeking $1,962,581.08 in principal; $535,929.03 in prepetition interest; $5,573.62 in late charges; and $163,978.72 in escrow charges.[43] The Debtor objected to TD Bank's proof of claim on the basis that state court determined the amount of TD Bank's claim was $1,538,971.38.[44] In addition, the

---

[39] *Id*. at p. 29, l. 17 – p. 31, l. 16.

[40] Debtor's Ex. 19. There is a slight discrepancy—$.01 to be precise—between the amount the state court determined TD Bank was entitled to and the amount of the final judgment. The state court's June 16, 2015 order determined TD Bank was entitled to $1,538,971.39; the final judgment awarded TD Bank $1,538,971.38.

[41] Debtor's Ex. 17.

[42] Debtor's Ex. 22.

[43] Debtor's Ex. 45.

[44] Debtor's Ex. 47 at ¶¶ 2 – 3.

Debtor contended that TD Bank was not entitled to $535,929.03 in interest because, as part of the Debtor's proposed sale of the property in June 2015, the Debtor effectively tendered payment of the $1,538,971.38 the state court determined TD Bank was entitled to, which the Debtor says TD Bank improperly rejected.[45] The Debtor also claims it is entitled to set off against the Debtor's claim any damages it suffered—lost profits, attorney's fees, broker's fees, etc.—resulting from TD Bank's refusal to accept tender of the $1,538,971.38 as part of the Debtor's proposed sale.[46]

The Debtor's property was sold in this bankruptcy case for $2,590,000. The Court must now determine the amount of TD Bank's claim so the sales proceeds can be distributed.

## CONCLUSIONS OF LAW

### The *Rooker-Feldman* doctrine does not preclude the Court from disregarding the state court final judgment.

As a threshold matter, the Court must consider whether the *Rooker-Feldman* doctrine precludes the Court from exercising jurisdiction over the state court final judgment. The *Rooker-Feldman* doctrine, which stems from the U.S. Supreme Court's decisions in *Rooker v. Fidelity Trust*[47] and *District of Columbia Court of Appeals v. Feldman*,[48] is a jurisdictional doctrine. Because 28 U.S.C. § 1257 grants the U.S. Supreme Court exclusive federal jurisdiction to review state court

---

[45] *Id.* at ¶¶ 5 – 8.

[46] *Id.* at ¶ 8; Debtor's Ex. 49 at ¶ 11.

[47] 263 U.S. 413 (1923).

[48] 460 U.S. 462 (1983).

judgments and 28 U.S.C. § 1331 limits the jurisdiction of district courts to original—not appellate—jurisdiction, the *Rooker-Feldman* doctrine generally recognizes that federal district courts lack jurisdiction to review state court judgments.[49]

But as the Supreme Court stated in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,[50] the *Rooker-Feldman* doctrine "has sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases."[51] Holding that the *Rooker-Feldman* doctrine should be "confined to cases of the kind from which the doctrine acquired its name,"[52] the Court went on to explain that in both *Rooker* and *Feldman*, the losing party in state court filed suit in federal court seeking review of a state court judgment after the state proceedings had ended.[53] In an effort to restore the doctrine to its roots, the *Exxon Mobil* Court limited the *Rooker–Feldman* doctrine to cases in which a federal court action was filed after a state court action ended.[54]

---

[49] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) ("Federal district courts, the *Rooker Court* recognized, lacked the requisite appellate authority, for their jurisdiction was 'strictly original.' Among federal courts, the *Rooker* Court clarified, Congress had empowered only this Court to exercise appellate authority 'to reverse or modify' a state-court judgment.") (citations omitted); *In re Anson*, 457 B.R. 130, 134 (Bankr. M.D. Fla. 2011) (explaining that the *Rooker-Feldman* doctrine "establishes the principle that lower federal courts have no jurisdiction to review state court judgments").

[50] 544 U.S. 280 (2005).

[51] *Id*. at 283.

[52] *Id*. at 284.

[53] *Id*. at 291.

[54] *Id*.; *Nicholson v. Safe*, 558 F.3d 1266, 1275 (11th Cir. 2009) (explaining that "*Exxon Mobil* clarified that the federal court action must be filed after the state proceedings have ended").

As the Eleventh Circuit pointed out in *Nicholson v. Shafe*,[55] however, the *Exxon Mobil* Court never addressed when a state court action has ended for *Rooker-Feldman* purposes. In *Nicholson*, the court looked primarily to the First, Eighth, and Tenth Circuits to answer the question, although it also considered cases from the Sixth and Ninth Circuits, as well.[56]

The First Circuit, in *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, held that state court proceedings have ended under *Rooker-Feldman* when a losing party allows the time for appeal to expire without filing an appeal.[57] The Eighth Circuit, in *Dornheim v. Sholes*, held that the *Rooker-Feldman* doctrine did not bar the district court from exercising jurisdiction over a federal civil rights claim because the state court action was not "complete." At the time the federal court action was filed in *Dornheim*, the state court action was on appeal to the state supreme court.[58] The Tenth Circuit, in *Guttman v. Khalsa*, likewise held that a state court action was not "final" under *Rooker-Feldman* when the state action was pending appeal.[59]

---

[55] 558 F.3d 1266 (11th Cir. 2009).

[56] *Id.* at 1275 – 76 (discussing *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 24 – 25 (1st Cir. 2005); *Dornheim v. Sholes*, 430 F.3d 919, 924 (8th Cir. 2005); *Guttman v. Khalsa*, 446 F.3d 1027 (10th Cir. 2006)).

[57] *Federacion de Maestros*, 410 F.3d at 24 – 25.

[58] *Dornheim*, 430 F.3d at 924.

[59] *Guttman*, 446 F.3d at 1029.

After surveying cases from the various circuits, the Eleventh Circuit ultimately held that a case has not ended for *Rooker-Feldman* purposes if a party has timely appealed a final judgment and the appeal is pending when the federal court action is brought:

> In conclusion, we agree with our sister circuits (the First, Eighth and Tenth Circuits) and hold the state proceedings have not ended for purposes of *Rooker-Feldman* when an appeal from the state court judgment remains pending at the time the plaintiff commences the federal court action that complains of injuries caused by the state court judgment and invites review and rejection of that judgment.[60]

Because there is no dispute TD Bank's appeal of the state court final judgment was pending when this bankruptcy case was filed, *Rooker-Feldman* does not preclude the Court from reviewing the state court final judgment here.

### The principal amount of TD Bank's claim is not limited to the amount of the state court final judgment.

While *Rooker-Feldman* does not divest this Court of jurisdiction over TD Bank's claim, the Court may nonetheless be bound by the state court final judgment.[61] In light of the pending appeal, the state court action has not ended, which means this Court is essentially confronted with parallel litigation. As the Supreme Court explained in *Exxon Mobil*, "[i]n parallel litigation, a federal court

---

[60] *Nicholson*, 558 F.3d at 1279.

[61] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005).

may be bound to recognize the claim- and issue-preclusive effects of a state court judgment."[62]

When deciding the preclusive effect of a Florida state court judgment, this Court must give that judgment the same preclusive effect that another Florida court would give it.[63] Under the Full Faith and Credit Act, this Court is required to "give state judicial proceedings 'the same full faith and credit . . . as they have by law or usage in the courts of such State . . . from which they are taken.'"[64] This Court, then, must consider whether a Florida court would give preclusive effect to the state court judgment here. There is no need for the Court to recite the elements of res judicata or collateral estoppel because even if they were met,[65] a Florida court would decline to apply res judicata or collateral estoppel under the facts of this case.

---

[62] *Id.*

[63] *Streicher v. U.S. Bank, N.A.*, 666 F. App'x 844, 846 (11th Cir. 2016) (citing *Exxon Mobil*, 544 U.S. at 293).

[64] *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 519 (1986) (quoting the Full Faith and Credit Act, 28 U.S.C. § 1738).

[65] *In re Davis*, 403 B.R. 914, 922 – 23 (explaining that "[f]or res judicata to apply, a party must establish the following four elements: '(1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases involve the same parties or their privies; and (4) both cases must involve the same causes of action'") (quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001)); *In re DeMasi*, 2015 WL 3956135, at *5 (Bankr. M.D. Fla. 2015) (explaining that "Florida's collateral estoppel doctrine forecloses relitigation if: '(1) the parties are identical with those from the prior case, (2) the issues are identical, (3) there was a full and fair opportunity to litigate the issues and they were actually litigated, and (4) those issues were necessary to the prior adjudication'") (quoting *Agripost, LLC v. Miami-Dade Cnty.*, 525 F.3d 149, 1055 (11th Cir. 2008)).

As this Court explained in *In re Anson*,[66] res judicata and collateral estoppel are equitable doctrines that should not be invoked where doing so would result in pernicious results.[67] In fact, the Florida Supreme Court "has long recognized that res judicata will not be invoked where it would defeat the ends of justice."[68] Likewise, the Florida Supreme Court has held that "collateral estoppel will not be invoked to bar relief where its application would result in a manifest injustice."[69] The Florida Supreme Court's unwillingness to apply res judicata and collateral estoppel when doing so would lead to a manifest injustice is based on the simple proposition that doctrines designed to promote judicial economy must give way to the fair and proper administration of justice:

> The basic principle upon which the doctrine of res judicata rests is that there should be an end of litigation and that "*in the interest of the State* every justiciable controversy should be settled in one action in order that the courts and the parties will not be pothered for the same cause by interminable litigation." Nevertheless, when a choice must be made we apprehend that the State, as well as the courts, is more interested in the fair and proper administration

---

[66] 457 B.R. 130, 136 (Bankr. M.D. Fla. 2011) (citing *Aeacus Real Estate Ltd. P'ship v. 5th Ave. Real Estate Dev., Inc.*, 948 So. 2d 834 (Fla. 4th DCA 2007)); *see also State v. McBride*, 848 So. 2d 287, 291 (Fla. 2003) (explaining that the Florida Supreme Court "has long recognized that res judicata will not be invoked where it would defeat the ends of justice" and that "collateral estoppel will not be invoked to bar relief where its application would result in a manifest injustice").

[67] *Anson*, 457 B.R. at 136.

[68] *McBride*, 848 So. 2d at 291.

[69] *Id.*

> of justice than in rigidly applying a fiction of the law
> designed to terminate litigation.[70]

This Court's decision in *Anson* is a good example of when application of res judicata and collateral estoppel would have resulted in a manifest injustice.[71] In that case, Liberty Savings Bank held first and second mortgages on property owned by ACT Enterprises. After ACT Enterprises defaulted, Liberty filed two separate foreclosure actions: one on the first mortgage and another on the second mortgage. Both actions included claims against Robert and Barbara Anson, who guaranteed ACT Enterprises' loan obligations. Liberty ultimately obtained a $215,043.03 foreclosure judgment in the action on the second mortgage, took title to the ACT Enterprises property at the foreclosure sale, and then sought a deficiency judgment.[72]

In calculating the amount of the deficiency judgment, the state court noted that ACT Enterprises owed $295,802.80 on the first mortgage. So the state court added the amounts owed on the first and second mortgages, which was $512,012.05, and then subtracted the fair market value of the property that Liberty took title to at the foreclosure sale, which was $450,000, to arrive at a $62,012.05 deficiency judgment.[73]

---

[70] *Universal Constr. Co. v. City of Fort Lauderdale*, 68 So. 2d 366, 369 (Fla. 1953) (quoting *Gordon v. Gordon*, 59 So. 2d 40 (Fla. 1952)).

[71] *Anson*, 457 B.R. at 135 – 36.

[72] *Id.* at 133.

[73] *Id.*

15

Liberty later obtained a $295,802.80 money judgment against the Ansons in the action on the first mortgage. When the Ansons filed for bankruptcy, Liberty filed a $359,561.81 claim based on the two state court judgments, failing to give the Debtors a $450,000 credit for the property it took back at the foreclosure sale. [74]

This Court recognized that giving both state court judgments preclusive effect would result in a windfall. Simple math dictated that the Ansons only owed Liberty $62,012.05.[75] The state court determined that ACT Enterprises owed $295,802.80 on the first mortgage and $215,043.03 on the second, which equaled $512,012.05. And the state court determined the fair market value of the property that Liberty took title to was $450,000. Yet, by arguing that the Court must give preclusive effect to both judgments, Liberty was trying to recover more than was legally due. In the end, this Court in *Anson* determined that judicial efficiency and economy had to give way to the fair and proper administration of justice:

> Both res judicata and collateral estoppel are equitable doctrines that are not to be invoked where they will inflict pernicious results. Because both doctrines are legal fictions designed to promote efficiency and judicial economy, the Court will not lose sight of the larger picture, which shows very clearly that Liberty is attempting to gain a windfall to the detriment of the Debtors and other creditors of their estate. The Court finds such a result to be manifestly unjust.[76]

---

[74] *Id.* at 133 – 34.

[75] *Id.* at 136.

[76] *Id.*

Here, applying res judicata or collateral estoppel would result in a windfall to the Debtor. The Debtor expressly agreed that in the event it defaulted under its prior confirmed plan, TD Bank would be entitled to the full amount due under the parties' original loan, which the Debtor stipulated back then was $2,001,929.63, less any payments the Debtor made on Note A under the plan. At trial in the state court action, TD Bank put on evidence that it had advanced $129,880.18 on Notes A and B and that the Debtor had made payments on Note A totaling $163,293.96. So the evidence at the state court trial was that the Debtor owed $1,968,515.85.

The only evidence the Debtor put on to dispute that amount was vague, unsupported testimony by a Debtor representative that TD Bank had not given the Debtor credit for all its supposed payments.[77] Although the evidence was undisputed that the Debtor owed $1,968,515.88 in principal and interest, the Debtor is now trying to use res judicata and collateral estoppel to reduce the principal amount of TD Bank's claim to $1,538,971.38—nearly $400,000 less than was actually owed at the time of the state court foreclosure proceeding.

The trial court's ruling that TD Bank was only entitled to $1,538,971.38 was based on two mistakes. First, the state court concluded that TD Bank's evidence at trial as to the amount owed was contradictory because TD Bank's representative testified that the Debtor owed "$2,001,000," while the documentary evidence showed it was actually more than $30,000 less. But the state court misunderstood the testimony by the TD Bank representative. The representative testified the

---

[77] Debtor's Ex. 11 at p. 30, l. 24 – p. 33, l. 3.

Debtor owed "[t]he $2,001,000 figure less any payments that were made," which accounts for the $30,000 or so discrepancy.[78] Second, the state court ruled that TD Bank's pleadings failed to put the Debtor on notice that the Bank was seeking the full $2,001,929.63 default amount. TD Bank's complaint, however, sought to accelerate the amounts due under the confirmed plan, which was attached to the complaint. TD Bank should not be punished—to the tune of more than $400,000— because of the state court's mistakes.

This Court is comfortable that TD Bank proved the amount owed. In fact, the Debtor still has not provided any competent, substantial evidence to dispute that it owed $1,968,515.85. It's obvious to the Court what happened here: Worst case, TD Bank didn't realize at the time it filed its foreclosure complaint in state court that it was entitled to the $2,001,929.63 default amount, and now the Debtor is trying to take advantage of the Bank's mistake. To allow the Debtor to take advantage of the Bank's mistake—when the Debtor knew all along TD Bank was entitled to the $2,001,929.63 default amount—would be grossly inequitable.

It's worth noting that even if res judicata or collateral estoppel did apply, the equitable doctrines still would not help the Debtor here. Assuming the Debtor is precluded from relying on the default provision to claim the full $2,001,929.63 default amount (less plan payments) owed, there is another provision that gives TD Bank the right to do so: Under the confirmed plan, TD Bank is entitled to a

---

[78] *Id.* at p. 19, ll. 1 – 6.

$2,001,929.63 secured claim "[i]n the event the Debtor files another bankruptcy petition prior to full payment of the Note A and Note B."[79]

A claim under that provision could not have been brought at the time of the initial state court foreclosure action because the Debtor obviously had not filed its second bankruptcy case yet. The Debtor did not file for bankruptcy a second time until after the state court foreclosure judgment. Res judicata, however, only covers claims that were or could have been brought at the time of the initial state court foreclosure action.[80]

Res judicata does not apply to events happening after the initial foreclosure judgment.[81] Nor does collateral estoppel apply here because TD Bank could not have litigated facts that had not occurred.[82] The filing of this case, then, is an independent basis for TD Bank's right to a $2,001,929.63 claim (less payments made), irrespective of the earlier state court judgment. So even if the state court judgment was entitled to preclusive effect, it still would not be a basis for objecting to the amount of TD Bank's claim here.

Here, TD Bank has claimed the principal amount of $1,962,581.08. That amount is derived first by taking the $2,001,929.63 default amount, adding

---

[79] Debtor's Ex. 2 at Amended Plan, § C.3.n

[80] *See Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) ("Put differently, we do not believe that the res judicata preclusion of claims that 'could have been brought' in earlier litigation includes claims which arise after the original pleading is filed in the earlier litigation.").

[81] *Id.* at 1359 – 60.

[82] *Dawkins v. Nabisco, Inc.*, 549 F.2d 396, 397 (5th Cir. 1977).

$129,880.18 in loan advances, and then crediting the Debtor for $163,293.96 in payments, resulting in the principal of $1,968,515.85. TD Bank concedes that principal amount has since been reduced by $5,934.77. The Debtor's only objection to the principal amount of TD Bank's claim is that TD Bank is precluded by res judicata and collateral estoppel from seeking more than $1,538,971.38. Because the Court declines to apply res judicata and collateral estoppel, the Court concludes TD Bank is entitled to the principal amount of $1,962,581.08.

### TD Bank is entitled to prepetition interest.

In *In re Kraz*, this Court ruled that a lender was prohibited from recovering interest on a loan where it prevented the borrower from tendering payment in full.[83] There, the lender sued the borrower in state court to foreclose its mortgage on the borrower's property.[84] The state court, however, ruled in the borrower's favor, finding that the lender had improvidently declared a default.[85] The state court reinstated the parties' loan and declared that because there was no default by the borrower, no accrued interest was due.[86] As part of determining the Debtor's new monthly payment, the lender represented to the state court that the adjusted balance on the borrower's note was around $4.8 million. But when the borrower found a buyer willing to pay almost $5.2 million for its property, the lender insisted

---

[83] 570 B.R. 389, 400 – 04 (Bankr. M.D. Fla. 2013).

[84] *Id.* at 394 – 95.

[85] *Id.* at 395.

[86] *Id.*

that the borrower owed $6.9 million, including more than $1.1 million in interest that the state court ruled the lender wasn't entitled to.[87] Because the lender's failure to provide an accurate payoff figure prevented the borrower from selling the property and paying the lender's loan in full, this Court ruled the lender was not entitled to post-maturity default interest.[88]

The Debtor argues that the Court should deny TD Bank interest here based on its decision in *Kraz*. According to the Debtor, the state court ruled TD Bank was entitled to $1,538,971.38. But when the Debtor says it had a buyer willing to pay more than $2.7 million for its property, TD Bank instead insisted on being paid more than $1.9 million in principal. But this case is different from *Kraz* in two crucial respects.

First, at the time the borrower requested an estoppel letter in *Kraz*, there was a final, nonappealable judgment determining the amount the lender was entitled to. In fact, the lender in that case had appealed the final judgment determining it was not entitled to accrued interest. And the lender lost. Here, the determination that TD Bank was only entitled to $1,538,971.38 had not even been reduced to a final judgment, let alone one that had been upheld on appeal, at the time the Debtor's proposed sale was supposed to close.

---

[87] *Id.* at 396 – 97.

[88] *Id.* at 400 – 04.

Second, there was no question that the proposed buyer in *Kraz* had the funds to close the sale. The sale in that case was for nearly $5.2 million. The buyer's letter of intent included a letter from its bank confirming the buyer's general partner had $5 million in its account. Here, it was not certain whether the buyer had the funding necessary to close.[89]

The only basis for denying TD Bank interest is the Debtor's claim that TD Bank refused to accept a tender of payment in full, thereby preventing the Debtor from paying off its loan in full. But there was no final, nonappealable judgment determining the amount TD Bank was entitled to. And even if there was, there was no evidence the proposed buyer could have closed on the sale. Because this case is different from *Kraz*, the Court concludes there is no basis for denying TD Bank interest on its loan (or awarding the Debtor any setoff for damages allegedly resulting from the purported sale falling through).

## CONCLUSION

The Debtor's various objections to TD Bank's proof of claim hinged on its argument that the state court's $1,538,971.38 final judgment is entitled to preclusive effect. Having determined that the state court judgment is not entitled to preclusive effect, the Court concludes that the Debtor's objection to TD Bank's proof of claim should be overruled in its entirety and that TD Bank is entitled to a $2,668,062.44 allowed claim in this case. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

---

[89] Debtor's Ex. 42 at p. 42, ll. 1 – 3.

Attorney Daniel Blanks is directed to serve a copy of this order on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of the order.

**Daniel F. Blanks, Esq.**
**Nelson Mullins Riley & Scarborough LLP**
*Counsel for TD Bank*

**Richard J. McIntyre, Esq.**
**Katie Brinson Hinton, Esq.**
**McIntyre Thanasides Bringgold, et al.**
*Counsel for the Debtor*